**HONEYWELL, INC.**

v.

**LITHONIA LIGHTING, INC.**
Civ. A. No. 11569.

United States District Court,
N. D. Georgia,
Atlanta Division.
Aug. 5, 1970.

Jones, Bird & Howell, Trammell E. Vickery, Eugene T. Branch and Earle B. May, Jr., Atlanta, Ga., for plaintiff.

Sam F. Lowe, Jr., Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

### Background

Plaintiff, Honeywell, Inc., is a manufacturer, vendor, and lessor of electronic data processing (computer) equipment. Its home office is in Wellesley Hills, Massachusetts, and it maintains a branch office in Atlanta, Georgia. Defendant is a manufacturer of industrial lighting fixtures. Its office and plant are located at Conyers, Rockdale County, Georgia.

Prior to January, 1966 defendant leased (and later purchased) a "Solid State 90" computer system from Univac Corporation which it used to monitor its accounting, payroll and sales operations. After its acquisition, however, the state of the art in computerization had progressed apace and while it performed and continued to perform its function, this equipment was no longer adequate to achieve defendant's goals, particularly since defendant wished to convert from an "in line" to an "in process" operation; that is, it wished to expand its computer functions beyond mere accounting and sales so as to include its entire manufacturing operation including raw materials, inventory, work in progress, and finished goods.

With this in mind, plaintiff and defendant began negotiations which led to a contract for the leasing by plaintiff to defendant of a Honeywell "200" comput-

er system. Both parties now contend this contract was breached by the other and each seeks damages. The case was tried to the court without a jury for approximately eight trial days, and in the opinion which follows the court now makes its findings of fact and conclusions of law.

### Terminology

After hearing the evidence in this case the first finding the court is constrained to make is that, in the computer age, lawyers and courts need no longer feel ashamed or even sensitive about the charge, often made, that they confuse the issue by resort to legal "jargon", law Latin or Norman French. By comparison, the misnomers and industrial shorthand of the computer world make the most esoteric legal writing seem as clear and lucid as the Ten Commandments or the Gettysburg Address; and to add to this Babel, the experts in the computer field, while using exactly the same words, uniformly disagree as to precisely what they mean. Such being the state of the art, the court concludes that before even discussing the contract it should make at least a preliminary attempt at computer definitions.

To begin with, an ordinary business computer, properly loaded and set, is intended to perform three basic functions: First, to store and retain within its innards a complete filing system concerning every employee, every bolt, every screw, every purchase, and every sale within a particular business operation, and to furnish, on command, complete and up-to-date information concerning each; second, to receive and record each change in each of these items as they occur, and, third, to perform routine office chores and computations, such as making out payrolls, printing checks, withholding and paying taxes, and reporting inventory. It can also be made to perform more intricate computations, to recite business history and to predict the future if properly loaded and set. Its components are myriad, each identified

by a separate English word whose meaning in the industry is wholly unrelated to that contained in the dictionary.

Perhaps the best recognized and most easily understood dichotomy in the trade is between "hardware" on the one hand and "software" on the other, and even here the experts do not always agree as to whether a particular item falls in one category or the other. Generally speaking, "hardware" refers to the naked, tangible parts of the machinery itself, while "software" denotes the information loaded into the machine and the directions given to the machine (usually by card or teleprompter) as to what it is to do and upon what command. "Software" is also frequently used to include "support"—that is, advice, assistance, counseling, and sometimes even expert engineering help furnished by the vendor in loading the machine for a certain program such as inventory control or preparation of payroll.

Preparation of input data and instructions to the machine in setting up a new program is both intricate and time consuming since every bit of information and every instruction has to be put in either by tape or card or, more recently, by a type of machine English called COBOL (Common Business Oriented Language) which the machine can be set to understand. Moreover, since no two businesses operate exactly alike or have exactly the same problems or goals, the program for each has to either be "tailor-made" for that particular business or a program from some related business has to be "modified" to meet its needs.

Since one of the prime functions of a computer is to supply instant information from that stored and kept up to date by the machine an important question arises as to how the material shall be stored and retrieved. Under one system the various items are stored on tapes in sequence. This is called a "sequential" system. Under this system if management wishes to inquire about Item 100 on the tape he has to wait while the machine plays through Items 1 to 99 before it gives him what he wants,

and this, of course, is time consuming. Another, more recent, system is referred to as either "direct" access or "random" access. Under this system, which operates on either drums or discs, the machine can be made to go directly to Item 101, or 201 or 301, as the case may be, without first playing the preceding items in sequence. In result, therefore, it is comparable to a selector button on a juke box as contrasted with an entire album on a single long-playing record.

## Opinion

Counsel in the case have each provided the court with well over 100 proposed findings and conclusions, many with innumerable subfindings and subconclusions. Were the court to adopt all or any substantial portion of them, this opinion would be rendered unnecessarily long and in many respects utterly incomprehensible. The court has therefore decided to adopt a more summary approach and to discuss, in detail, only those features of the case which it deems controlling.

To summarize these conclusions at the outset, however, the court concludes that the plaintiff, Honeywell, has proved its case and that the defendant has failed to prove either its defense or its counterclaim.

In the period from late 1965, when negotiations began, through August, 1967, when the contract was cancelled by Lithonia, the defendant Lithonia was already a computer user. During this period it had three successive managers of its Electronic Data Processing (EDP) Department—first Corbett, then Kelly, and finally Bowman. All of them were computer experts. The first of these managers, Corbett, was not only experienced, but had been a teacher in the computer field, having used Honeywell equipment in his classrooms. His recommendations to Lithonia management carried great weight, and from the date of the execution of the first contract in January of 1966 until Bowman became EDP manager on July 11, 1967, Lithonia and its Vice President, Creviston, had left it to the determination of Corbett and Kelly as to what equipment was necessary, and all basic company communications to Honeywell about EDP equipment went through these two managers. Corbett had extensive and broad experience in almost every aspect of EDP and with the products of all vendors of computer equipment. He was thoroughly familiar with its capabilities and, in addition, he caused Lithonia to acquire the services of independent experts to evaluate and double-check Lithonia's computer needs and his conclusions. Both he and Kelly knew precisely what Honeywell's equipment would do and both of them, though no longer with Lithonia at the time of trial, have testified that Honeywell's equipment performed exactly as represented. They have also testified unequivocally that Honeywell supplied all support which it promised and that during their tenure in office (from January 1, 1966, into July of 1967) no complaint was ever made to Honeywell about any failure of its equipment or about any breach of its contract.

On September 20, 1967, after Lithonia had cancelled the contract and in response to an inquiry from Honeywell, Mr. Creviston, the Vice President of Lithonia, cited certain alleged defaults upon which Lithonia relied in terminating the contract. The court knows of no better approach to this case than to discuss these complaints one by one.

The first default alleged by Mr. Creviston was "removal by Honeywell of the on-site maintenance engineer without Lithonia's approval." All parties agree that under the contract Honeywell was to furnish a resident on-site maintenance engineer and did furnish one. Later, however, he was removed from the premises. At this time Mr. Kelly was Lithonia's EDP manager, and as to this subject he testified unequivocally and in substance that by that time some of the problems initially encountered had been solved and that Lithonia needed the space occupied by the engineer and that he, Kelly, asked Honeywell for a progressive phase-out of the on-site en-

gineer. At this point performance of the computer had improved measurably and, according to Kelly's testimony, he arranged with Honeywell, with Creviston's approval, to have the maintenance engineer move from the premises and to thereafter be available on an "on call" basis. He testified further that this arrangement was tried and was successful. It also appears without dispute that after the on-site engineer was released neither Kelly nor Creviston nor anyone else from Lithonia ever complained of this change in the arrangement or denied this understanding, and no one ever asserted to Honeywell that it was not fulfilling its obligations in this regard. In fact, no default with respect to the presence of the maintenance engineer was ever claimed by Lithonia until Creviston's letter of September 20, 1967. The court concludes that this alleged claim of default is utterly without merit.

■ The second default claimed by Lithonia in the letter of September 20, 1967 was "failure of Honeywell's support in that the COBOL Compiler support disc files had not yet been made available." This complaint raises the whole issue as to what Honeywell agreed to supply, and did supply, in terms of "support" and also what it agreed to supply, and did supply, in the field of disc or direct access equipment. In this regard the evidence is almost without dispute: First, that Lithonia knew they were not getting disc equipment; second, that it was not available at the time, either from Honeywell or its competitor, IBM (in this regard an order for such equipment had previously been placed with IBM but was cancelled by Lithonia because IBM could not make delivery for a year and a half); third, that both Corbett and later Kelly did not want either disc or direct access equipment but were convinced that a tape system such as Honeywell supplied would be adequate for their present needs; and fourth, that neither of them knew when, if ever, Lithonia would need such equipment in the future. It also appears that, much later, when Kelly, after consultation with Creviston, actually placed an order with Honeywell for disc equipment. Creviston cancelled and deleted this item from the order and initialed the deletion. It is true that still later, after both Corbett and Kelly had gone, and after Bowman had taken over as EDP manager, he and Creviston again expressed interest in direct access disc equipment. This was on July 13, 1967. It is clear that Honeywell was apparently eager to sell such equipment to Lithonia at that time and promised to make a presentation to Lithonia on the subject. With this in mind, Creviston and Bowman thereafter went to Honeywell's home office in Wellesley, Massachusetts, to look into the subject, but placed no order. In fact, at this time and on July 20, 1967, Bowman had already decided to do away with Honeywell's equipment and had in fact already placed an order for substitute equipment with IBM. It thus appears that the only order ever placed by Lithonia with Honeywell for a total direct access system using discs was expressly cancelled by Creviston and no subsequent order was ever placed. In this regard it is extremely significant to the court that whereas the previous EDP managers, Corbett and Kelly, had been committed to tape operations as distinguished from disc operations, and whereas they were satisfied in general with the performance of the Honeywell equipment, Bowman, who succeeded them, was familiar with IBM equipment from past experience and that at the first opportunity after becoming EDP manager he deliberately caused Lithonia to switch to IBM. It also very clearly appears that at the time he did so, he was totally unfamiliar with the existing contracts and obligations between Honeywell and Lithonia and that he caused Honeywell's equipment to be thrown out and IBM's equipment to be ordered in utter disregard of these undertakings.

■ The third default alleged by Lithonia was "failure of support, in that instead of providing an experienced Honeywell analyst to assist in the imple-

mentation of the Honeywell package, Honeywell provided only a former IBM programmer, briefly trained in the Honeywell system." Again, however, the testimony is that Honeywell in fact furnished two programmers, together with support personnel. This matter of "packages", or "programs", deserves some further comment. Packages, of course, fall in the area of "software" in computer terminology. They consist of one or more pre-programmed routines or applications that go onto a computer as sort of a base program. As one witness testified, "They are to a computer what a record is to a victrola." There may be one package or program, for example, which is designed to handle payrolls; another may be calculated to solve problems related to inventory; a third may handle accounts payable or receivable. A package, however, as furnished in the computer industry (and many firms in the computer field compile and sell nothing but packages) cannot be made in advance to fit just any business operation. Instead it is either one which has been successfully used in some other related or similar business and which will therefore have to be modified or altered so as to conform to the particular business in which it is to be used, or it has to be made from scratch for a particular operation. At this point it is significant to note that neither in the contract nor in the correspondence nor elsewhere did Honeywell ever agree to furnish any completed packages. What it did agree to do was to make available to Lithonia such related packages as it had for use by Lithonia to the extent that they could be adapted to its operations. Without going into minute detail, the evidence shows that Honeywell furnished to Lithonia innumerable packages which it was free to try to adapt to its various operations. Many of them were in fact used by Lithonia, albeit without complete satisfaction. In this regard the evidence is also clear that in many instances it is simpler to compose a new program tailor-made to suit a particular business than to try to adapt a pre-programmed package from some other business. In this regard Corbett, the original EDP manager, testified categorically that he concluded that many of the packages made available by Honeywell would require too much modification and would result in a patched-up system which would not be as efficient as a system written especially for Lithonia. He concluded that in the long run he would save more time by writing a new one, with the help of Honeywell. He also discussed this with Creviston and had recommended that Lithonia undertake to write its own program. In short, the evidence shows that all applications packages which had been discussed between the parties and in which Lithonia had expressed interest were made available by Honeywell during the spring and summer of 1966, and prior to the time when Lithonia requested and executed a contract for five years instead of three. Corbett also testified unequivocally that Honeywell's support was adequate and that it made no misrepresentation to him as to its capabilities in this regard.

The fourth default alleged by Lithonia charges "failure to provide a Bill of Materials Processor Package [1] to meet Lithonia's requirements in the manufacturing control area and failure to provide a workable TRIM package." Again, however, Honeywell did not contract to sell or guarantee to furnish any particular completed packages. It was not in the business of selling packages or programs. All it did agree to do was to make available, for Lithonia's consideration and at no charge, such packages or programs as it might have. This it did, but Kelly, who had by that time become EDP manager for Lithonia, con-

---

1. A "Bill of Materials Processor Package" as used here is a software computer program or package applicable in a manufacturing operation intended to keep a complete inventory and list of every component part necessary to build or assemble one (or 500) completed units of the product being manufactured—in the case of Lithonia the product would be lighting fixtures.

cluded that Lithonia could write a Bill of Materials Processor (package) faster than it could modify the packages furnished by Honeywell. The evidence also shows that he did write a Bill of Materials Processor which became operational by March of 1967 and was used through July 1967. He testified that his Bill of Materials Processor contained many errors, not in the machine but in the programming, and that this took more time than he had anticipated. But during this period he never at any time called upon Honeywell for assistance. In fact Kelly testified that his Bill of Materials Processor worked satisfactorily and that he thought it was adequate for Lithonia's needs.

In alleged Default No. Five Lithonia charges a "failure in Honeywell's card reader." With respect to this item, the evidence shows that Lithonia did have trouble with the card reader and that Honeywell worked upon it. The evidence is that it was erratic but not necessarily unreliable. The evidence also shows that it was finally discovered that the trouble lay in a voltage meter which Lithonia itself had incorrectly wired when the system was installed.

Default No. Six is allged to be the "improper functions of the COBOL tape compiler resulting in inability to batch-compile programs, resulting in needless, time-consuming delays in implementing new systems and maintaining assisting programs and generation of incorrect instructions by the compiler." With respect to this item it is again necessary to trace a little chronology. When Bowman was employed by Lithonia on April 11, 1966, Kelly was still head of the EDP department and Bowman was materials manager. Part of the material to be used in the COBOL tape compiler had, of course, been prepared by Kelly in his department, but Bowman had likewise had prior COBOL experience and wrote some programs of his own. He had some initial difficulty in doing this but in time became accom-

plished and adept at using the Honeywell version of the COBOL compiler. Admittedly, it did give some trouble but Kelly testified that he determined the cause to be that Lithonia was attempting to intermix two different programs, one from Kelly's department and one from Bowman's department, and that the compiler would not function properly under such conditions. He testified that he quickly identified the cause and found the solution, which was not to intermix such programs. He testified that these imperfections did not impair or impede Lithonia's progress and that he was able to effectively utilize the compiler.

Finally, in alleged Default No. Seven, Lithonia lists "inability to supply a tested Bill of Materials Processor and COBOL compiler to support disc files." But Honeywell never agreed to furnish a tested Bill of Materials Processor or a COBOL compiler. It did agree to make available such packages, including processor and compiler packages, as it had for consideration by Lithonia. It certainly never agreed to furnish such packages to be used in connection with disc equipment. As previously stated, Lithonia had no disc equipment and wanted none. Both Corbett and Kelly were committed to tape equipment and had concluded that tape equipment was adequate for their needs. It is true that on two occasions direct access equipment was ordered by Lithonia but in each instance these orders were cancelled by Lithonia itself and Honeywell was still trying to sell Lithonia such equipment at the time the notice of termination was received.

In summary we repeat: the plaintiff proved its allegations; the defendant did not.

### Damages

With respect to damages, Lithonia concedes that "The measure of recovery by Honeywell as lessor would be the equivalent of the specified rentals for the remainder of the lease term, less the

expense of performance by Honeywell during the remainder of the term as respects the hardware leased and other Honeywell responsibilities under the contract." (Lithonia's Post-Trial Brief, p. 81.)

Lithonia contends further, however, that any net damage to Honeywell—as computed above—must be reduced by the amount of rentals that might have been obtained from a leasing by Honeywell to someone else. Lithonia recognizes that the burden of showing potential reduction in rentals by such a re-leasing is upon Lithonia but apparently contends that it has done so since Honeywell disassembled the equipment after its return instead of keeping it intact, for sale or lease. If Lithonia had shown that Honeywell had more customers than it could supply from inventory this contention would have merit. However, the evidence shows that Honeywell had more equipment than customers. Furthermore, Lithonia's own witness (who unhesitatingly gave a figure as to what the equipment would have sold for) testified to the effect that there was little or no market for used equipment of this kind.

Lithonia also makes much of the fact that a few components from the Lithon-ia equipment have been used in equipment supplied to other customers, but there was no evidence to show that Honeywell would not have had an adequate supply of those parts if the Lithonia equipment had not been returned.

■ Honeywell contends, and the court agrees, it should recover from Lithonia the net profit which Honeywell would have realized on the remainder of the contract, computed by deducting from the gross rental due for the balance of the contract period both the direct costs [2] (maintenance, depreciation, amortization, taxes and insurance) and the indirect costs [3] (marketing support and operating expenses) which Honeywell would have incurred in performing its part of the agreement if no breach had occurred.

Stated in equation form this comes out in dollar amounts as follows: Gross rental due, $315,750—Direct costs, $121,435—Indirect costs $44,393—Profit (damages), $159,922.

Counsel for the plaintiff may present a judgment in accordance herewith.

It is so ordered.

2. Under "Direct Costs" Honeywell includes:

(1) Maintenance costs of $40,100, computed by figuring the ratio of M200 maintenance expense to H200 revenue income [Lithonia says historical maintenance cost of the Lithonia equipment itself should be used here, but since these costs vary with the age of the equipment, Honeywell's method appears to be more accurate].

(2) Depreciation of the production cost of the Lithonia configuration for remaining life of contract, amounting to $60,625.

(3) Amortization of research and development costs over the remaining life of contract, amounting to $13,132.

(4) Taxes and insurance in the amount of $7,578, computed as the ratio of property taxes and insurance expenses to revenue [Annese, T. p. 521].

3. Under "Indirect Costs" Honeywell includes:

(1) Marketing support costs in the amount of $2,818. This figure represents the cost of manpower support to be furnished during the remainder of the contract life and is based on figures from their marketing personnel section showing that such support requires eight manpower months during the first year after installation of the equipment, 1½ man months the second year, and one-half man months per year after that.

(2) Operating expenses of $31,575, representing the ratio of total operating expenses (excluding marketing expenses, which are incurred prior to, and in early days of, the contract and are written off then) to total revenue of computer division. [Lithonia says no deduction has been made for software expenses saved, but this is included in operating expenses. Annese, T. 572.]